UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN PARDOVANI,

Plaintiff,

-v-

CROWN BUILDING MAINTENANCE
CO., *et al.*,

Defendants.

15-CV-9065 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff John Pardovani brings this action against Defendants Crown Building
Maintenance Co. d/b/a Able Building Maintenance, Jazz at Lincoln Center, Inc., Richard Cruz,
and Joseph Miele under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title
VII"), 42 U.S.C. §§ 2000e *et seq.*, and the New York City Human Rights Law ("NYCHRL"),
N.Y.C. Admin. Code § 8-101 *et seq.*, alleging racial discrimination and retaliation.  (*See* Dkt.
No. 16.)  Defendant Joseph Miele asserts counterclaims against Plaintiff for defamation and
intentional infliction of emotional distress.  (Dkt. No. 57 at 15–18.)

Before this Court are three motions for summary judgment.  Defendants Crown Building
Maintenance Co. d/b/a Able Building Maintenance and Joseph Miele (collectively, "Able")
move for summary judgment on Plaintiff's claims.  (Dkt. No. 109.)  Defendants Jazz at Lincoln
Center and Richard Cruz (collectively, "JALC") also move for summary judgment on Plaintiff's
claims.  (Dkt. No. 105.)  And Plaintiff moves for summary judgment on Defendant Joseph
Miele's counterclaims.  (Dkt. No. 95.)  For the reasons that follow, Able's motion for summary
judgment is denied, JALC's motion for summary judgment is denied, and Plaintiff's motion for
summary judgment is granted in part and denied in part.

1

I.      **Background**

Able provides janitorial, engineering, and other services in residential and commercial buildings across the country.  (Dkt. No. 107 ("Able SOF") ¶ 1.)  JALC is a non-profit arts organization that, among other things, hosts music and dance performances in its performance venues.  (Dkt. No. 102 ("JALC SOF") ¶¶ 1, 3.)  Between 2004 and 2011, JALC successively contracted with Collins Building Services, Inc.,[1] ABM Industries, and OneSource Services to provide janitorial, maintenance, engineering, and other such services.  (JALC SOF ¶¶ 5–6; JALC CSOF ¶ 5.)  In August 2011, Able assumed the JALC contract to provide these services pursuant to a service agreement.  (JALC SOF ¶ 7.)

Throughout Pardovani's employment, he has provided services to JALC.  (Able SOF ¶ 17.)  Pardovani was initially hired by Collins to work at JALC in 2004.  (Able SOF ¶ 15.)  He has worked for each subsequent company that held the JALC contract.  (JALC SOF ¶ 66.)  When Able assumed the service agreement in 2011, Pardovani was retained as a Janitor.  (Able SOF ¶ 16.)  There are several supervisory individuals relevant to this action.  From August 2011 to August 2016, Pardovani was directly supervised by Defendant Joseph Miele.  (Able SOF ¶ 21.)  Kimo Luciano was the Day Shift foreman throughout the relevant time period.  (Able SOF ¶ 7.)  Miele and Kimo Luciano were both Able employees.  (*See* Able SOF ¶¶ 7, 11.)  Defendant Richard Cruz was the Operations Manager for JALC, and Ken Luciano was the Facility Director for JALC.  (JALC SOF ¶ 13.)

In November 2014, Pardovani complained to JALC's then-Vice President of Human Resources and Office Administration, Gail Winicki.  (Able SOF ¶ 32.)  While Able asserts that

---

[1] Collins is referred to throughout the record as "Colon."  (*See* Dkt. No. 114 ("JALC CSOF") ¶ 6.)

Pardovani failed to complain of any racial discrimination at the time (Able SOF ¶ 33), Pardovani counters that he did raise harassment and discrimination concerns (Dkt. No. 117 ("Able CSOF") ¶¶ 32–33).  When JALC informed Able about Pardovani's complaint, it was ultimately investigated by Russell Hale, the Senior Human Resources Business Partner for Able.  (Able SOF ¶ 34.)  While Able claims that Pardovani's complaint was solely about alleged nepotism, Pardovani maintains that he also continued to complain of racial discrimination.  (Able CSOF ¶ 36.)

Able claims that, in March 2015, Pardovani began to act erratically and became insubordinate.  (Able SOF ¶ 55; *see also* Able SOF ¶¶ 58–67.)  Pardovani disputes this characterization of his behavior.  (Able CSOF ¶ 58.)  This included an alleged pattern of "generalized workplace complaints."  (Able SOF ¶ 55.)  On April 30, 2015, Pardovani filed an incident report about Kimo Luciano.  (Able SOF ¶ 48.)  Again, while Able asserts that this complaint did not refer to any racial discrimination (Able SOF ¶¶ 53–54), Pardovani disputes this, insisting that he did complain of racial discrimination at the time (Able CSOF ¶¶ 53–54).  On May 12, 2015, Pardovani filed another complaint about Ken Luciano, Cruz, and Miele.  (Able SOF ¶¶ 68–70.)  It is undisputed that this particular complaint did not specifically mention racial discrimination.  (Able SOF ¶ 71; Able CSOF ¶ 71.)

On August 28, 2015, Pardovani filed a complaint alleging that Cruz, Miele, Ken Luciano, and Kimo Luciano harassed and discriminated against him.  (Able SOF ¶ 94.)  Scott Donnigan, Miele's supervisor, spoke to Pardovani about his complaint.  (Able SOF ¶ 99.)  In September 2015, he and Miele ultimately suspended Pardovani with pay pending investigation of that complaint — allegedly to ensure that he was safe.  (Able SOF ¶¶ 101–102.)  Hale conducted an investigation of the complaint.  (Able SOF ¶ 111.)  While he did find that it was "more likely

than not" that both JALC and Able employees used the term "nigger" and derivations thereof, he ultimately concluded that Pardovani's complaint of racial discrimination was unfounded.  (Able SOF ¶¶ 114–115.)  However, in response, all Able and building maintenance staff took part in harassment training.  (Able SOF ¶¶ 130–131.)

On November 18, 2015, Pardovani initiated this action.  (*See* Dkt. No. 1.)  Following the filing of the complaint, Pardovani reported workplace grievances on five separate occasions.  (Able SOF ¶¶ 133–151.)  Two of these complaints regarded Kimo Luciano's use of the "N word."  (Able SOF ¶¶ 140–142, 151.)  After the first incident, Kimo Luciano was reprimanded for violation of Able's harassment policy and warned that any further violations would result in disciplinary action.  (Able SOF ¶ 146.)  Able asserts that the second complaint was duplicative of the first (Able SOF ¶ 151), but Pardovani counters that the complaint also referred to Miele's discriminatory conduct (Able CSOF ¶ 151).  Able argues that Pardovani's continued complaints are due to mental illness, specifically paranoia.  (*See* Able SOF ¶¶ 157–178.)

Joseph Miele ultimately resigned from Able on August 15, 2016, and began working for Barnard College as an Operations & Facility Manager.  (Dkt. No. 111 ("Pardovani CSOF") at 2 ¶ 2; 9 ¶ 11.)  On February 2, 2017, Pardovani sent an email to twenty-three Barnard College employees noting, among other things, that Ken Luciano and Miele had been involved in "several discriminatory incidents," were "very familiar" with the Latin Kings, and that they were involved in this litigation.  (Pardovani CSOF at 10 ¶ 14.)  On April 3, 2017, Miele asserted counterclaims against Pardovani arising out of this email.  (Dkt. No. 57.)

## II.    Legal Standard

Summary judgment under Rule 56 is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014). The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks omitted) (second quoting *Lunds, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

## III. Discussion

### A. Able's Motion for Summary Judgment

Able moves for summary judgment on all of Plaintiff's hostile work environment and retaliation claims brought under Title VII, § 1981, and the NYCHRL. The Court considers each group of claims in turn.

#### 1. Hostile Work Environment Claims

Able first argues that Pardovani's hostile work environment claims must fail as a matter of law. Under Title VII and § 1981, "[a] hostile work environment claim requires a showing that: (1) the plaintiff was subjected to harassment, based on his protected class, that was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an

5

abusive working environment'; and (2) 'that a specific basis exists for imputing the objectionable conduct to the employer.'" *Hartley v. Rubio*, 785 F. Supp. 2d 165, 183 (S.D.N.Y. 2011) (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)) (second alteration in original); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (noting that hostile work environment claims under § 1981 are analyzed under the same standard as those under Title VII).

Able argues that the evidence is insufficient to support the inference that any inappropriate comments were pervasive enough to sustain a hostile work environment claim. In evaluating hostile work environment claims, courts must "examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (alterations omitted). "Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004) (citations omitted).

However, Pardovani offers evidence to suggest that, far from an occasional occurrence, the word "nigger," and derivations thereof, were used frequently and offensively in the workplace. Pardovani has offered evidence that both JALC and Able supervisors used the word on a regular basis. Defendant Richard Cruz allegedly used the word in anger, and despite Pardovani's requests for him to stop. (*See* Dkt. No. 118-1 at 61:23–64:22.) Cruz's former supervisor, Ken Luciano, allegedly used the word frequently, as well as making derogatory racial comments and racial jokes in the workplace. (*See* Dkt. No. 126-1 at 114:15–115:24; Dkt. No.

126-5 at 35:24–36:12.)  Defendant Joe Miele admitted that he used the word at the workplace.

(*See* Dkt. No. 118-7 at 123:22–124:15.)  Foreman Kimo Luciano also allegedly used the word

frequently, including during a verbal altercation with Pardovani.  (*See* Dkt. No. 118-1 at 149:13–

150:10; Dkt. No. 126-5 at 35:24–36:9.)  Indeed, allegedly not only Pardovani, but also others

complained about the frequency of its use.  (*See* Dkt. No. 126-4 at 25:11–22.)

      As one court noted, "[g]iven American history, we recognize that the word 'nigger' can

have a highly disturbing impact on the listener.  Thus, a plaintiff's repeated subjection to hearing

that word could lead a reasonable factfinder to conclude that a working environment was

objectively hostile."  *McKay v. Principi*, No. 03 Civ. 1605, 2004 WL 2480455, at *6 (S.D.N.Y.

Nov. 4, 2004) (alteration in original) (quoting *Hrobowski v. Worthington Steel Co.*, 358 F.3d

473, 477 (7th Cir. 2004)).  And "when a supervisor wields the authority delegated to him by an

employer . . . to further the creation of a discriminatorily abusive work environment, the

supervisor's conduct is deemed to be that of the employer."  *Murray v. N.Y. Univ. Coll. of

Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995).  Because Pardovani offers evidence that supervisors

used the word regularly in the workplace, thus contributing to the alleged hostile work

environment, a reasonable factfinder could find Able liable for their conduct.

      To combat this evidence, Able makes the curious argument that Pardovani could not have

been justifiably offended by the use of the "N word" in the workplace because he had used the

word on social media.  (*See* Dkt. No. 106 at 18.)  It is not unheard of for in-group members to

simultaneously re-appropriate racialized terminology for use, while maintaining an objection to

its use by out-group members.  And it is undisputed that none of the Able and JALC supervisors

who used the word were African American.  Able's additional argument that Pardovani suffers

from "paranoid and irrational thoughts," and that paranoia drives his hostile work environment

claims, is also unavailing.  (*See* Dkt. No. 106 at 18.)  Suffering from mental illness is not

mutually exclusive from the notion of being subject to a hostile work environment.  Both of

these arguments suffer from the same fundamental flaw.  Ultimately, Pardovani affirmatively

testified that he was offended by the continual use of the "N word" in the workplace.  (*See* Dkt.

No. 118-1 at 320:16–321:10.)  To the extent that Able attempts to cast doubt on Pardovani's

credibility on that point with each of these arguments, that determination must be made by the

factfinder at trial and is inappropriate on a motion for summary judgment.  *See Rogoz v. City of

Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) ("[A] district court generally cannot grant summary

judgment based on its assessment of the credibility of the evidence presented." (citation

omitted)).

    Finally, Able invokes the *Faragher/Ellerth* affirmative defense to shield itself against

Pardovani's hostile work environment claims.  *See Faragher v. City of Boca Raton*, 524 U.S.

775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  The

*Faragher/Ellerth* defense "consists of two elements: that (1) the employer exercised reasonable

care to prevent and correct promptly any discriminatory harassing behavior, and (2) the plaintiff

employee unreasonably failed to take advantage of any preventative or corrective opportunities

provided by the employer or to avoid harm otherwise."  *Gorzynski v. JetBlue Airways Corp.*, 596

F.3d 93, 103 (2d Cir. 2010) (internal quotation marks, alteration, and citations omitted).[2]

    It is clear that Able satisfies the first prong of the analysis.  "An employer may

demonstrate the exercise of reasonable care, required by the first element, by showing the

---

[2] An employer may not avail itself of the defense if a "[s]upervisor's harassment
culminates in a tangible employment action."  *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509,
521 n.3 (S.D.N.Y. 2015) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)).  As
discussed in further detail *infra* Section III.A.2, there is a factual dispute regarding whether this
occurred.

existence of an antiharassment policy during the period of the plaintiff's employment, although that fact alone is not always dispositive." *Ferraro v. Kellwood Co.*, 440 F.3d 96, 102 (2d Cir. 2006) (citations omitted).  It is undisputed that Pardovani was aware of Able's antiharassment policy and the reporting channels for harassment.  (Able CSOF ¶¶ 27–29.)  In response, Pardovani argues that the fact that harassment continued even after he complained precludes summary judgment here.  (*See* Dkt. No. 116 at 12.)  However, "an employer is not required to prove success in preventing harassing behavior" to satisfy the first prong of the analysis. *Cajamarca v. Regal Entm't Grp.*, 863 F. Supp. 2d 237, 249 (E.D.N.Y. 2012) (citing *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999)).  Because Pardovani offers no other evidence to suggest that Able failed to exercise reasonable care other than the notion that they were unsuccessful in putting a stop to the harassment, Able is able to satisfy the first prong of the analysis as a matter of law.

However, it is not correspondingly clear that Pardovani unreasonably failed to take advantage of Able's procedures.  Able argues that Pardovani "failed to provide any support for his allegations," thereby leaving them unsubstantiated.  (Dkt. No. 106 at 20.)  Able's assertion seems to be referring to the allegation that Pardovani refused to be questioned by Russell Hale regarding his complaint.  (*See* Able SOF ¶ 98.)  However, that allegation is disputed.  (Able CSOF ¶ 98.)  And in any event, it is undisputed that Pardovani did ultimately speak to Hale and answer his questions.  (Able CSOF ¶¶ 106, 109–110.)  On this record, this Court cannot conclude that it is beyond genuine dispute that Pardovani failed to provide enough information to substantiate his complaints such that Able could not fully act upon them.

Because Able cannot establish that it is entitled to the *Faragher/Ellerth* at the summary judgment stage, Pardovani's § 1981 and Title VII hostile work environment claims must survive.

And because the federal hostile work environment claims have not been dismissed, thereby providing "a *floor* below which the City's Human Rights law cannot fall," *Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 299 (S.D.N.Y. 2019) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)), Pardovani's NYCHRL hostile work environment claims likewise survive.

### 2.    Retaliation Claims

The Court now turns to Pardovani's retaliation claims brought under Title VII, § 1981, and the NYCHRL.  "Retaliation clams under Title VII and § 1981 are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework." *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015) (footnote omitted).  To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) he engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; (4) there was a causal connection between the protected activity and that adverse action.  *Id.* at 315–16.

Retaliation claims brought under the NYCHRL require a lower standard.  To prevail on a retaliation claim under the NYCHRL, a plaintiff must show (1) that he took an action opposing his employer's discrimination, and (2) that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action.  *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 838 (S.D.N.Y. 2013) (quoting *Mihalik*, 715 F.3d at 112).  "A defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives."  *Mihalik*, 715 F.3d at 113 (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39–40 & n.27 (App. Div. 1st Dep't 2009)).

Able moves for summary judgment on the ground that Pardovani's month-long suspension with pay pending investigation into his complaint did not constitute an adverse

employment action.  However, "suspension with pay may, in some circumstances, rise to the

level of an adverse employment action." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir.

2012).  To determine whether suspension with pay is an adverse employment action, a court

must determine "whether the employer has simply applied reasonable disciplinary procedures to

an employee or if the employer has exceeded those procedures and thereby changed the terms

and conditions of employment."  *Id.* (citation omitted).  Pardovani argues that there was no

reasonable disciplinary basis for suspending him pending the investigation of *his* complaint.

(*See* Dkt. No. 116 at 11–12.)  For that reason, there exists a genuine factual dispute as to whether

Able's suspension was reasonable under the circumstances.  Accordingly, Pardovani's Title VII

and § 1981 retaliation claims survive.  And because the federal retaliation claims have not been

dismissed, thereby providing "a *floor* below which the City's Human Rights law cannot fall,"

*Gonzalez*, 377 F. Supp. 3d at 299 (quoting *Mihalik*, 715 F.3d at 109), Pardovani's NYCHRL

retaliation claims likewise survive.

### B.      JALC's Motion for Summary Judgment

JALC moves for summary judgment on the basis that there was no employment

relationship between it and Pardovani, and therefore it cannot be held liable for any employment

discrimination he suffered.  Pardovani argues that JALC is a joint employer and therefore may be

held liable in this action.  "[U]nder the joint employer doctrine, liability may be found when

separate legal entities have chosen to handle certain aspects of their employer-employee

relationships jointly."  *Forsythe v. N.Y.C. Dep't of Citywide Admin. Servs.*, 733 F. Supp. 2d 392,

397 (S.D.N.Y. 2010) (internal quotation marks and citation omitted).  An entity may be found to

be a joint employer only where there exists "sufficient evidence of immediate control over the

employees."  *Liotard v. Fedex Corp.*, No. 14 Civ. 2083, 2016 WL 1071034, at *4 (S.D.N.Y.

Mar. 17, 2016) (quoting *Clinton's Ditch Co-op Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir. 1985)).

11

The "immediate control" determination is made based on whether the entity: "(1) did the hiring and firing; (2) directly administered any disciplinary procedures; (3) maintained records of hours, handled the payroll, or provided insurance; (4) directly supervised the employees; or (5) participated in the collective bargaining process."  *AT&T v. NLRB*, 67 F.3d 446, 451 (2d Cir. 1995) (citation omitted).

### 1.    Hiring and Firing

The record is mixed regarding whether JALC was involved in the hiring of Able employees to work in the JALC building.  Miele stated that JALC "had no part in the hiring process[,] in making decision[s] on seniority[,] and who or why [Able employees] were there." (Dkt. No. 104-7 at 46:21–23.)  Instead, Miele asserted that he was responsible for hiring.  (*See* Dkt. No. 104-7 at 47:21–22.)

However, when Pardovani was originally hired by Collins in 2004, he was interviewed both by Joe Thomas, who was employed by JALC, and Ken Luciano, who was then employed by Collins, which held the JALC contract at the time.  (*See* Dkt. No. 113 at 5.)  Specifically, he recounts that while Ken Luciano was resistant to hiring him, Thomas "wanted to give [him] a chance," and he was subsequently hired.  (*See* Dkt. No. 115-11 at 42:8–43:22.)  Further, Able employee Kimo Luciano asserted that he also was hired by Thomas in 2004 "[t]o work for the [JALC] building and whatever third party" JALC contracted with.  (Dkt. No. 115-17 at 25:5–11.)

JALC argues that because Collins, and not Able, held the contract for custodial services in 2004, these instances are irrelevant for the purposes of determining whether Able and JALC are joint employers.  (Dkt. No. 101 at 7 n.8.)  However, Kimo Luciano provides at least some evidence suggesting that JALC exerted influence over hiring that did not depend on who technically held the JALC contract.  (*See* Dkt. No. 115-17 at 25:5–11; *see also* Dkt. No. 115-17 at 25:18–20 ("Able just took over [the JALC contract] and that's how [Kimo Luciano] became

an employee of Able.").)  Viewing the "evidence in the light most favorable to the non-moving party," *Allen*, 64 F.3d at 79, JALC seems to have at least some measure of control over who was hired by Able to work at the JALC site.

However, there does not appear to be any evidence that JALC had the ability to terminate Able employees.  Under the service agreement between JALC and Able, Able agreed to "discharge any . . . employee from working" at JALC if Able received any report from JALC "that any Able employee is incompetent, unfit, disorderly or is using profane, abusive or other inappropriate language to any person."  (Dkt. No. 103-1 ¶ 15.)  However, the service agreement refers to removal from the JALC jobsite, not termination from employment at Able.  (*Id.*)  Able makes all decisions regarding whether to terminate an employee, and JALC has never suggested that Able should terminate an employee.  (*See* Dkt. No. 104-6 at 29:16–31:4.)

In *Liotard*, the court noted that in the temporary staffing context the ability to request reassignment is akin to termination authority because when a temporary employee's placement ends, she is typically no longer working.  *Liotard*, 2016 WL 1071034, at *5 (citation omitted). Therefore, such a request is a "constructive termination."  *Id.*  In contrast, it found that where the plaintiff "was performing janitorial services as an independent contractor" the same considerations did not apply, and thus a reassignment did not create termination authority such that supported a joint employer finding.  *Id.*  Here too, Pardovani was performing janitorial services that JALC contracted out to Able.  This Court therefore agrees that an "entity that has the power to request that an employee be moved but not to cause her to be terminated" does not weigh in favor of a joint employer finding.  *Id.* (citation omitted).

Therefore, while it seems clear on this record that JALC did not have the power to terminate Able employees, there exists a factual dispute regarding the extent of JALC's influence on Able's hiring for the JALC jobsite.

### 2.    Administration of Disciplinary Procedures

There also exists some evidence in the record to suggest that JALC was able to formally discipline Able employees.  Cruz denied that he had any responsibility for disciplining Able employees, or that he ever recommended that any Able employee be disciplined.  (*See* Dkt. No. 104-3 at 143:13–144:10.)  Pardovani argues that he was verbally reprimanded by Cruz and Ken Luciano, who were both JALC employees, which he offers as evidence that JALC was involved in the administration of disciplinary procedures.  (*See* Dkt. No. 113 at 8–9; *see also* Dkt. No. 115-2 ¶ 12.)  However, that JALC employees expressed their displeasure with Pardovani's work product is not probative of whether JALC had responsibility to *formally* administer disciplinary procedures with respect to Able's employees.  Further, all written warnings received by Able employees that exist in the record were issued by Able rather than JALC.  (Dkt. Nos. 104-12, 104-13.)  And when Pardovani was ultimately suspended, Able employees Miele and Donnigan issued the suspension.  (*See* Able SOF ¶¶ 101–102.)

On the other hand, Pardovani offers an email from Winiecki informing Cruz that she was undertaking a joint investigation of Pardovani's claims and warning him not to "take any disciplinary (verbal or written) action against [Pardovani] without [her] approval."  (Dkt. No. 115-7.)  This statement does suggest that there is some measure of power to discipline Able employees.  And it is particularly probative because of Winiecki's relatively senior role in JALC's Human Resources Department.  Taken together then, there seems to be some dispute regarding whether JALC had any role in the administration of disciplinary procedures.

### 3.     Records, Payroll, and Insurance

It is undisputed that JALC does not hold any administrative records regarding Able employees (*see* Dkt. No. 103 ¶ 12), and that Able pays its employees and provides them with insurance (*see* Dkt. No. 104-7 at 31:9–32:13).  Pardovani argues that JALC and Able have a "commonality of insurance" under their service agreement.  (Dkt. No. 113 at 11.)  Under that agreement, Able maintains insurance workers' compensation insurance and employer's liability insurance under which JALC is a named insured.  (Dkt. No. 103-1 ¶ 10.)  However, it is undisputed that Able, and not JALC, holds the insurance.  Accordingly, this factor does not weigh in favor of a joint employer finding.

### 4.     Direct Supervision

It is undisputed that Pardovani was assigned work by both JALC and Able employees.  Cruz concedes that he gave assignments directly to Plaintiff once or twice a week.  (Dkt. No. 104-3 at 113:23–114:14.)  However, JALC asserts that while Cruz requested that Pardovani complete general tasks, he did not instruct Pardovani as to how to do the work.  (*See* Dkt. No. 101 at 19.)  This is critical, because "where supervision 'consists primarily of telling employees what work to perform, or where and when to perform the work, but not how to perform the work,' the supervision does not support a joint employer finding."  *Liotard*, 2016 WL 1071034, at *6 (quoting *Serv. Emps. Int'l Union, Local 32BJ v. NLRB*, 647 F.3d 435, 443 (2d Cir. 2011)).  However, Pardovani contests this characterization and claims that Cruz did instruct him as to how to perform the work.  (*See* Dkt. No. 115-2 ¶¶ 4–11.)  And Cruz conceded that part of his role was to "manag[e]" Able employees.  (*See* Dkt. No. 104-3 at 60:4–7.)  Accordingly, there exists a factual dispute regarding the level of direct supervision exercised by JALC employees.

###### 5.      Participation in Collective Bargaining Process

There is no suggestion in the record that JALC participates in the collective bargaining process.  Able, not JALC, is a party the collective bargaining agreement with the relevant union. (Dkt. No. 103 ¶ 11.)  And Pardovani does not advance the argument that JALC was otherwise involved in collective bargaining with regard to Able employees.  Accordingly, this factor weighs against a joint employer finding.

* * *

In sum, there is no evidence that JALC is involved in the termination of JALC employees; that JALC is responsible for records, payroll, or insurance; or that JALC participates in the collective bargaining process.  However, there are factual disputes as to whether JALC is involved in the hiring of employees, administration of disciplinary procedures, or the direct supervision of Able employees.  On such a muddled factual record, it cannot be said that "no reasonable trier of fact could find" that JALC is a joint employer.  *Allen*, 64 F.3d at 79. Accordingly, JALC's motion for summary judgment must be denied.

### C.      Plaintiff's Motion for Summary Judgment

Pardovani moves for summary judgment on Miele's defamation and intentional infliction of emotional distress counterclaims stemming from an email that Pardovani sent to Miele's employers on February 7, 2017.  (*See* Dkt. No. 95.)

#### 1.      Defamation Claim

"To establish a claim for defamation under New York law, a [counterclaimant] must prove that: (1) the [counter defendant] published a defamatory statement of fact to a third party, (2) the statement was false, (3) the false statement of fact was made with the applicable level of fault, and (4) either the false statement was defamatory per se or caused the [counterclaimant] special harm."  *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 485 (S.D.N.Y. 2013).  And where, as

16

Miele argues is the case here, false statements are made that "tend to injure another in his or her trade, business, or profession" they are defamatory per se and thus do not require proof of special damages. *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992). Critically however, such statements "must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the [counterclaimant]'s character or qualities." *Id.* at 348 (citation omitted).

Pardovani's email contained five allegedly defamatory statements. The Court considers each in turn.

First, Pardovani stated in the email that Miele was "involved in several discriminatory incidents." (Dkt. No. 96-2.) It is axiomatic that "truth provides a complete defense to defamation claims." *Cain v. Atelier Esthetique Inst. of Esthetics Inc.*, 733 F. App'x 8, 11 (2d Cir. 2018) (summary order) (alteration omitted) (quoting *Dillon v. City of New York*, 704 N.Y.S.2d 1, 39 (App. Div. 1st Dep't 1999)). Critically, "a statement need not be *completely* true, but can be *substantially* true, as when the overall gist or substance of the challenged statement is true." *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) (internal quotation marks and citation omitted). Pardovani argues that his statement was undisputedly true because Miele has admitted that he did not "see how [he] couldn't have" used the "N word" at work. (*See* Dkt. No. 96-1 at 123:22–124:15.) While the word "bears clear racial connotations," *Coleman v. Nonni's Foods, LLC*, No. 15 Civ. 2791, 2015 WL 8773467, at *3 (S.D.N.Y. Dec. 14, 2015) (citation omitted), whether *discrimination* occurred is in factual dispute — indeed it forms the basis of this lawsuit. It is for a jury to decide whether the context in which the word was used rises to the level of discrimination. Without more, the Court cannot determine whether the statement was indeed

true at the summary judgment stage.  Therefore, Miele's defamation claims on this statement survive.

Second, Pardovani stated that Miele "resigned before receiving [a] notice of . . . termination," implying that the resignation occurred due to Miele's discriminatory conduct. (Dkt. No. 96-2.)  Pardovani argues that he had a good faith belief that the statement was true when he made it, and thus it cannot be defamatory as matter of law.  "Good faith communications of a party having an interest in the subject, or a moral or societal duty to speak, are protected by a qualified privilege if made to a party having a corresponding interest or duty." *Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 410 (2d Cir. 2000) (alteration and citation omitted).  Whether Pardovani indeed had a good faith basis to believe that Miele resigned in order to avoid termination is disputed.  (*See* Pardovani CSOF ¶¶ 16a, 16b.)  And a reasonable factfinder could determine that as the alleged victim of workplace discrimination, Pardovani would have an interest in disclosing that Miele resigned as a result of that workplace discrimination to his current employer.  Miele's employer presumably would have a corresponding interest in learning whether one of its employees resigned as a result of allegations of workplace discrimination.  Accordingly, whether this statement is actionable cannot be resolved on summary judgment and Miele's defamation claim may go forward on this ground.

Third, Pardovani attached a photo of a swastika that had been made out of black electrical tape and placed in the locker room.  (Dkt. No. 96-2.)  In the text of the email, he indicated that he had "attached a few pictures [of] incidents involving both [Ken Luciano and Joseph Miele]," thereby implying that one or both of them were responsible for taping the swastika.  (*See id.*) Pardovani advances no argument that this statement was true or made in good faith. Accordingly, Miele's defamation claim may go forward on this basis.

Because the aforementioned statements involved allegations of workplace discrimination by a subordinate, the statements were "matter[s] of significance and importance" for the management role that he held at Barnard College.  *See Liberman*, 80 N.Y.2d at 436; (Pardovani CSOF at 9 ¶ 11).  However, that is the not the case with respect to Pardovani's claim that Miele was "very familiar" with the Latin Kings, which he claimed had prejudiced views regarding African Americans and other ethnic groups.  (*See* Dkt. No. 96-2.)  The notion that Miele had familiarity with a gang, even if false, is the sort of "general reflection upon [his] character" that does not qualify as defamation per se.  *Liberman*, 80 N.Y.2d at 436.  Because Miele does not argue that he suffered any special damages as a result of any of the statements contained in the challenged email (*see* Dkt. No. 110 at 8), this statement is not actionable.  The defamation claims based on this statement are therefore dismissed.

Finally, Pardovani's statement that Miele would "not become an asset to [Barnard College] but a liability" (Dkt. No. 96-2) is an opinion rather than a statement of fact.  While "pure opinion" is non-actionable, "mixed opinion" is actionable.

> Pure opinion is a statement of opinion which is accompanied by a recitation of the facts upon which it is based or does not imply that it is based on undisclosed facts.  Mixed opinion . . . is an opinion that *does* imply a basis in undisclosed facts, or facts known only to the author.

*Chau*, 771 F.3d at 129 (internal quotation marks and citation omitted).  The Court concludes that this statement is pure opinion rather than mixed opinion.  Pardovani's email very clearly accuses Miele of workplace discrimination.  And it is that allegation of discrimination that forms the basis of his opinion that he would not be an asset to Barnard College.  While the statements of fact that Miele was responsible for workplace discrimination are actionable if false, the conclusion that Miele would be a liability to Barnard College is an opinion based on that

19

statement, and seemingly nothing more.  Accordingly, all defamation claims based on this statement are dismissed.

In sum, Miele's defamation claims based on Pardovani's statements regarding Miele's alleged involvement in workplace discrimination, including whether he resigned to avoid being terminated and had some involvement in taping up a swastika in the locker room, are all subject to factual dispute and therefore cannot be dismissed at the summary judgment stage.  In contrast, Pardovani's allegation that Miele has some familiarity with the Latin Kings and that he would not be an asset to Barnard College are both non-actionable statements and all defamation claims based on those two statements are dismissed.

### 2.    Intentional Infliction of Emotional Distress Claim

"Intentional infliction of emotional distress . . . is an extremely disfavored cause of action."  *Durant v. A.C.S. State & Local Sols. Inc.*, 460 F. Supp. 2d 492, 499 (S.D.N.Y. 2006).  Under New York law, "intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress."  *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)).

"New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress."  *Id.* (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983)).  "[T]he conduct in question must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'"  *Medcalf,* 938 F. Supp. 2d at 488 (quoting *Murphy*, 448 N.E.2d at 90).  That Pardovani sent a single email to Miele's employers accusing him of discrimination does not reach the level of outrageous conduct

20

required to satisfy the first element of an intentional infliction of emotional distress claim.  *See*

*Herlihy v. Metro. Museum of Art*, 633 N.Y.S.2d 106, 114 (App. Div. 1st Dep't 1995) (finding

that false accusations of anti-Semitic slurs in the workplace did "not rise to the level of outrage

required" for an intentional infliction of emotional distress claim).

Further, an intentional infliction of emotional distress claim "may be invoked only as a

last resort to provide relief in those circumstances where traditional theories of recovery do not."

*Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal quotation marks and citations

omitted).  As a result, New York courts have held that intentional infliction of emotional distress

claims cannot "be brought where the challenged conduct falls well within the ambit of other

traditional tort liability."  *Id.* (internal quotation marks and citation omitted); *see also id.*

(collecting cases).  Miele's claims are fully encompassed by his defamation claim, obviating the

need for him to proceed on an intentional infliction of emotional distress theory.

Accordingly, Miele's counterclaim for intentional infliction of emotional distress is

dismissed.

## IV.    Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED in

part and DENIED in part.  Defendants Crown Building Maintenance Co. and Joseph Miele's

motion for summary judgment is DENIED.  Defendants Jazz at Lincoln Center and Richard

Cruz's motion for summary judgment is DENIED.

Counsel for all parties shall appear for a telephonic status conference in the case on June

19, 2020, at 12:00 p.m.  At the appointed time, counsel and any interested parties shall call (888)

557-8511, and use the access code 9300838.

The Clerk of Court is directed to close the motions at Docket Numbers 95, 100, 105, and

109.

SO ORDERED.

Dated: May 20, 2020
New York, New York

_____
J. PAUL OETKEN
United States District Judge